17-466-cv
Davies v. Davies

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of December, two thousand seventeen.

PRESENT:   BARRINGTON D. PARKER,
           GERARD E. LYNCH,
           CHRISTOPHER F. DRONEY,
                   *Circuit Judges*.

-----------------------------------------------------------------------

CHRISTOPHER E. DAVIES,

             *Petitioner-Appellant*,


        v.                                                No. 17-466-cv


SALLY K. DAVIES,

             *Respondent-Appellee*.*

-----------------------------------------------------------------------


FOR PETITIONER-APPELLANT:        RICHARD MIN, Camhi & Min LLC,  New York, NY.


FOR RESPONDENT-APPELLEE:         VALENTINA SHAKNES (Linda Rosenthal, Justine A. Stringer, & Jordan Messeri, *of counsel*), McLaughlin & Stern LLP, New York, NY.

---

* The Clerk of Court is directed to amend the official caption as set forth above.

1

FOR *AMICUS CURIAE*:

Lewis J. Liman (Rahul Mukhi, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Dean Jeffrey L. Edleson, Professor Steven Marans, Professor Evan Stark, Professor Alicia Lieberman, Dr. Luz Towns-Miranda, Dr. Leonard L. Glass, Dr. Marie G. Rudden, The National Association of Social Workers, The Leadership Council on Child Abuse and Interpersonal Violence, The American Psychoanalytic Association, The Confederation of Independent Psychoanalytic Societies, and The American Association for Psychoanalysis in Clinical Social Work as* amicus curiae *in support of Respondent-Appellee.*

FOR *AMICUS CURIAE*:

William C. Silverman, Proskauer Rose LLP, New York, NY; William D. Dalsen (James R. Anderson, *on the brief*), Proskauer Rose LLP, Boston, MA, *for Sanctuary for Families, Legal Momentum, Dr. Jacquelyn Campbell, Domestic Violence Legal Empowerment and Appeals Project, My Sister's Place, University of Oregon School of Law Domestic Violence Clinic, Her Justice, New York Legal Assistance Group, National Network to End Domestic Violence, Battered Mother's Custody Conference, Americans Overseas Domestic Violence Crisis Center, and Lawyers Committee Against Domestic Violence as* amicus curiae *in support of Respondent-Appellee.*

FOR *AMICUS CURIAE*:

Lea Haber Kuck (Emma S. Gardner, Christina A. Pryor, & Eva Y. Chan, *on the brief*), New York, NY, *for Child Justice, Inc., Professor Jennifer Baum, and Safe Horizon, Inc. as* amicus curiae *in support of Respondent-Appellee.*

2

Appeal from a January 26, 2017 judgment of the United States District Court for the Southern District of New York (Briccetti, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Petitioner-Appellant Christopher E. Davies appeals the denial of his petition for repatriation of his five-year-old son K.D. to French St. Martin[1] pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–9011. In July 2016, K.D.'s mother, Respondent-Appellee Sally K. Davies, removed K.D. from French St. Martin to New York after suffering years of psychological abuse and increasingly violent behavior from Mr. Davies, much of which occurred in the presence of K.D. Indeed, Mr. Davies's uncontrollable anger and abusive behavior was often directed at K.D.

Based on documentary evidence and testimony from Ms. Davies, Mr. Davies, nine other fact witnesses, and five expert witnesses during a nine-day bench trial, the United States District Court for the Southern District of New York (Briccetti, *J.*) issued its findings of facts and conclusions of law denying Mr. Davies's petition for repatriation of K.D. *See Davies v. Davies*, No. 16-cv-6542, 2017 WL 361556, at *1–17 (S.D.N.Y. Jan. 25, 2017). There is no dispute that Mr. Davies has set forth a *prima facie* case for repatriation of K.D. under the Convention. *See* 22 U.S.C. § 9003(e)(1)(A). Accordingly, the principal issue on appeal is whether Ms. Davies satisfied her burden of proving, by clear and convincing evidence, that one of the four narrow exceptions to the Convention's repatriation provision applies: that the return of K.D. to French St. Martin would expose him to a "grave risk" of "physical or psychological harm or otherwise place [him] in an intolerable situation" under Article 13(b) of the Convention. *See id.* § 9003(e)(2)(A); Hague Convention, art. 13(b); *Blondin v. Dubois*, 238 F.3d 153, 156–57 (2d Cir. 2001) (noting that Convention requires repatriation in all but four "exceptional circumstances" and discussing grave-risk exception).

---

[1] For the first time on appeal, Mr. Davies argues that the district court should have considered the possibility of returning K.D. to continental France, where none of the parties have ever lived, rather than to French St. Martin. Because Mr. Davies's petition for return specifically requested that the court return K.D. "to his Habitual Residence of Saint Martin," J.A. 21, and Mr. Davies did not suggest this possibility to the district court, we decline to consider this argument in the first instance. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015) ("It is well settled that arguments not presented to the district court are considered waived [or forfeited] and generally will not be considered for the first time on appeal.").

"We review the district court's interpretation of the Convention *de novo* and its factual findings for clear error." *Marks v. Hochhauser*, 876 F.3d 416, 418 (2d Cir. 2017). Additionally, "[t]he district court's application of the Convention to the facts is subject to *de novo* review." *Id.* We assume the parties' familiarity with the remaining facts, the procedural history of the case, and the issues on appeal, which we reference only as necessary to explain our decision to affirm.

## I. Findings of Fact

On appeal, Mr. Davies challenges several of the district court's factual findings, which "[w]e must accept . . . unless we have a definite and firm conviction that a mistake has been committed." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (internal quotation marks omitted). We also "owe[] particularly strong deference where the district court premises its findings on credibility determinations." *Mathie v. Fries*, 121 F.3d 808, 812 (2d Cir. 1997). Therefore, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). Having carefully examined the record, we conclude that the district court's factual findings challenged by Mr. Davies are not erroneous, much less clearly erroneous.

For example, Mr. Davies contends that the district court's findings concerning a violent incident on April 15, 2016 are clearly erroneous. Upon review of the testimony of both Mr. and Ms. Davies, as well as the post-incident photographs and video, which corroborate Ms. Davies's testimony, we are not left with "a definite and firm conviction" that the district court's findings are mistaken. *See Souratgar*, 720 F.3d at 103. The record amply supports the district court's findings that Mr. Davies, during an argument with Ms. Davies, threw a full wine glass at her, shattered a glass door by kicking it in anger (severely injuring himself in doing so), and subsequently walked around the kitchen while bleeding profusely to further berate Ms. Davies—as the toddler K.D., awakened by Mr. Davies's violent outburst, stood by crying. We also accord "particularly strong deference," *Mathie*, 121 F.3d at 812, to the district court's decision to discredit Mr. Davies's version of the events, which it found not "remotely plausible" for reasons that are apparent from his testimony. Special App. 15; *see* J.A. 1523–33, 1582–90.

Mr. Davies also argues that "[t]here is no evidence in the record to support a finding that K.D. was afraid of [him]." Pet'r Br. 17. We disagree. For example, on one occasion when Mr. Davies threw laundry in the face of Ms. Davies while he yelled at her, K.D. hid behind a chair, according to a non-party witness. In any event, although this Court has *considered* whether a child fears a parent, among other factors, in repatriation

4

actions under the Convention, "we d[id] not mean to suggest that only evidence of . . . the child's fear of a parent can establish a successful Article 13(b) defense." *See Souratgar*, 720 F.3d at 105. Moreover, K.D.'s purported lack of fear of Mr. Davies does not contradict the district court's finding that Mr. Davies subjected K.D. to severe and frequent psychological abuse. Indeed, K.D. demonstrated little fear of his father during one nevertheless abusive incident just before Ms. Davies fled French St. Martin. Mr. Davies, in a "shaking" rage, screamed at her and K.D., "corner[ed]" them in K.D.'s bedroom, and followed them out of the house to the beach, where K.D. drew a (literal) line in the sand and told Mr. Davies "don't go over this line, daddy. Stay away from mummy." J.A. 691–92. Additionally, a non-party witness testified that (i) it was "a pretty regular occurrence" for Mr. Davies to berate Ms. Davies while "towering over her," (ii) K.D. was present during "a high proportion" of these outbursts, and (iii) K.D., when not crying and becoming upset, would step in front of Ms. Davies and tell his father to "stop yelling at mommy." J.A. 1030–31.

Finally, Mr. Davies emphasizes that the "record . . . clear[ly] demonstrates that there was no physical violence from [Mr. Davies] against either [Ms. Davies] or K.D." Pet'r Br. 19. As an initial matter, this argument is not particularly relevant under these circumstances because, as the district court found, the abuse here is primarily psychological in nature, and the district court based its legal conclusions under the Convention principally on the risk of psychological harm to K.D. We acknowledge, as the district court did, that Mr. Davies's "pervasive, manipulative violence . . . left few physical scars" on K.D. Special App. 35. But the record belies the assertion that Mr. Davies directed no physically violent behavior toward K.D. and toward Ms. Davies in K.D.'s presence. Setting aside the disturbing incidents set forth above, Mr. Davies's sustained pattern of abusing Ms. Davies in K.D.'s presence included, among other things: yelling at her and pushing her out of the way while K.D. stood by; ripping K.D. out of her arms; and screaming in her face because K.D. wanted to sleep with her.[2] Mr. Davies also directed these violent outbursts at K.D., including: spanking K.D. so hard that he left a hand-print; slamming on his car's brakes to teach K.D. to put on his seatbelt; screaming profanities at him; throwing K.D.'s toys and other objects in anger; and forcefully pushing K.D. out of the room to berate Ms. Davies.[3]

---

[2] The district court also found that there was credible evidence that Mr. Davies sexually abused Ms. Davies, including choking her during sex and engaging in coercive sex. The district court nevertheless accorded this evidence "little weight" in its analysis because, unlike the remainder of Mr. Davies's abusive behavior, the sexual abuse did not directly affect K.D. and could not be corroborated by other fact witnesses.

[3] It is also notable that Mr. Davies, in K.D.'s presence, broke the leg of the family's puppy by throwing it across a room, because it urinated in the house.

Accordingly, we conclude that the district court's findings of fact are not clearly erroneous, including its findings (i) that K.D. was subjected to severe and persistent psychological abuse by Mr. Davies, and (ii) that this abuse would continue if K.D. returned to French St. Martin.

## II.     Conclusions of Law

As the district court correctly noted, under Article 13(b)'s grave-risk-of-harm exception to repatriation, "[t]he potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Souratgar*, 720 F.3d at 103 (alterations and internal quotation marks omitted). "This grave risk exception is to be interpreted narrowly," *id.* (internal quotation marks omitted)—a rule that the district court was "acutely aware of." Special App. 32.

"We have held that Article 13(b) relief could be granted if repatriation posed a grave risk of causing unavoidable psychological harm to the child," and "[e]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse." *Souratgar*, 720 F.3d at 104 (alterations, citation, and internal quotation marks omitted). But spousal abuse is relevant under Article 13(b) only if it "seriously endangers the child," and the "inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Id.* at 103–04. The grave risk inquiry "involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.* at 103.

As this Court has acknowledged, "these [are] fact-intensive cases," *id.* at 104, and "at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship . . . [and] at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," *Blondin*, 238 F.3d at 162. We conclude this appeal presents circumstances that fall at the latter end of the spectrum.

Reviewing *de novo* the district court's application of Article 13(b) to its well-supported factual determinations, we affirm its decision to deny the petition for repatriation because returning K.D. to French St. Martin would, by clear and convincing evidence, expose him to a grave risk of psychological harm. Based on Mr. Davies's psychological abuse of not only K.D., but also of Ms. Davies in K.D.'s presence, we find no error in the district court's conclusions as to the magnitude of the potential psychological harm to K.D.—"severe"—and the probability of that harm materializing if he returned to French St. Martin—"a near certainty." Special App. 35; *see Souratgar*, 720 F.3d at 103. This conclusion is not based on "[s]poradic or isolated incidents," or

6

"conjecture and speculation" of abuse, *Souratgar*, 720 F.3d at 103–04; rather, as the district court explained, it is premised on "*overwhelming evidence* of Mr. Davies's extreme violence and uncontrollable anger, as well as his psychological abuse of Ms. Davies *over many years*, much of which was witnessed by K.D., and the fact that Mr. Davies frequently screamed and yelled at K.D. for no legitimate reason."[4]   Special App. 34 (emphasis added).   Like the district court, we find alarming Mr. Davies's escalation of violence immediately prior to the departure of K.D. and his increasingly hostile threats since then. If K.D. returned and Mr. Davies were to follow through on his threat "that there was no amount of money that he would take to exact his revenge on [Ms. Davies]," J.A. 642—and there is clear and convincing evidence that he would—there is no doubt K.D. would suffer grave psychological harm.

Finally, we identify no error in the district court's conclusion that there are no ameliorative measures that would protect K.D. from harm if he returned to French St. Martin.   *See Blondin*, 238 F.3d at 163 n.11 ("[B]efore a court may deny repatriation on the ground that a grave risk of harm exists under Article 13(b), it must examine the full range of options that might make possible the safe return of a child to the home country.").   The district court heard testimony from four expert witnesses concerning the protections afforded to victims of domestic violence (children and spouses) under French St. Martin's legal system.   Moreover, the district court was in the best position to evaluate Mr. Davies's credibility about abiding by certain ameliorative measures (such as a stay-away order), which was marred by (i) his deceit and manipulation of the legal system in French St. Martin, (ii) his untruthfulness and unwillingness to accept responsibility for his actions while testifying, and (iii) his escalating threats toward Ms. Davies even after their separation.   The day before Ms. Davies and K.D. left French St. Martin, Mr. Davies told her that he would rather take all their money, burn it, and kill himself than resolve their dispute "through the courts."   J.A. 694.   We decline to disturb the district court's careful and thorough evaluation of the ameliorative measures.

---

[4] Accordingly, we need not decide whether Dr. Brandt's testimony that K.D.'s return to French St. Martin "would set off a tremendous traumatic reaction in" him, J.A. 538, but without a formal diagnosis of post-traumatic stress disorder, suffices to demonstrate a grave risk of psychological harm standing alone. *See Blondin*, 238 F.3d at 163 (holding, upon *de novo* review, that almost certain recurrence of post-traumatic stress disorder in children satisfied Article 13(b)'s grave-risk requirement).

\*\*\*

We have considered Mr. Davies's remaining arguments and conclude that they are without merit.   Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court